**C. Douglass BUCK, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Alice duPont BUCK, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. Nos. 1788, 1789.

United States District Court
D. Delaware.

July 18, 1957.

Caleb S. Layton and Rodney M. Layton (of Richards, Layton & Finger), Wilmington, Del., for plaintiffs.

Leonard G. Hagner, U. S. Atty., Wilmington, Del., and Gerard J. O'Brien, Washington, D. C., for defendant.

LEAHY, Chief Judge.

Plaintiffs—C. Douglass Buck and Alice duPont Buck, his wife—brought their actions against the United States under 28 U.S.C. § 1346(a) (1). Both causes were consolidated for trial to the Court. Plaintiffs seek a monetary return of taxes paid on a certain gift of real estate. After trial, observance and evaluation of testimony of witnesses for all parties, including an examination of the documentary proofs, the decision rests on the following findings of fact and conclusions of law.

1. On December 31, 1951, plaintiffs made a gift of 45½ acres of land.[1] On March 5, 1952, plaintiffs executed and filed with the Director of Internal Revenue at Wilmington, Delaware, gift tax returns in respect of the gift of this real estate located at the northeast junction of the Montchanin and Barley Mill Roads in the Third District of Christiana Hundred, New Castle County, Delaware, with the buildings thereon erected (hereinafter called "Rokeby"). The returns contained a consent that the gifts should be considered as having been one-half by each plaintiff as husband and wife, pursuant to the provisions of 26 U.S.C. § 1000(f).[2] The gift tax returns as filed February 16, 1952, included a written appraisal of Rokeby by Mr. Elsworth Vernon, a licensed real estate broker and tax assessor for Wilmington. He placed a value of $44,400 on the acreage and $16,000 on the improvements or a total amount of $60,400. With reference to the acreage this consisted of $1,300 for the front 24.46 acres of Rokeby, or a total of $32,000, and $600 for the rear 21 acres, or a total of $12,400.[3] The amount of the tax shown payable by plaintiffs on the gift tax returns was paid by each to the District Director of Internal Revenue at Wilmington, Delaware.[4]

2. The District Director filed a report, November 18, 1954, increasing the valuation of Rokeby to $75,200, and presented a deficiency claim against plaintiffs. They paid it.[5] Then the District Director forwarded to plaintiffs a further report, dated January 20, 1955, in which the valuation of Rokeby was increased for the second time to $120,000. By a letter, dated February 17, 1955, the amount of the tax deficiency owing by plaintiff C. Douglass Buck was stated to be $5,040, which, together with interest in the sum of $1,000.20 (for the period of March 15, 1952, to July 6, 1955), or a total of $6,040.20, was paid by him. The tax deficiency disclosed in the same letter for Alice duPont Buck was $6,552, which, together with interest in the sum of $1,300.26 (for the period of March 15, 1952, to July 6, 1955), or a total of $7,852.26, was paid by her.[6]

3. Plaintiffs then filed with the District Director claims for refund for the aforesaid amounts. No action was taken on these claims within the six months period allowed by law. The present suit was thereafter timely instituted.[7]

4. On the gift date, December 31, 1951, Rokeby comprised about 45.46 acres and with improvements of a three story stone house, a stone barn and other outbuildings. These improvements were all located at the rear portion of the property. The house is located approximately 1,200 to 1,300 feet back from the entrance to the estate on Montchanin Road with an eight foot wide asphalt road leading from the entrance to the house. The frontage on Montchanin Road consists of approximately 1,021 feet. On Barley Mill Road it consists of approximately 2,365 feet. There is a small frontage on Breck's Lane, and a common boundary to the rear with property owned by S. Hallock duPont, which property is situated along Brandywine

1. Complaint and Answer, par. 2; R. 35, 50, 84, 90, 108, 145.

2. Complaint and Answer, par. 2.

3. R. 143, 146.

4. Complaint and Answer, par. 3.

5. Complaint and Answer, par. 4.

6. Complaint and Answer, pars. 5, 6.

7. Complaint and Answer, par. 7; 26 U.S.C. § 3772(a) (2), 1939 Code, as amended.

Creek and Henry Clay Road, once a part of Rokeby, and where the original Charles I. duPont house stands.

## Opinion

From here on in the evidence is in conflict as to what the actual value of the gift-land was. The available techniques call for a fact-finding process by the court as to what the gift was worth. It calls for an educated guess—a quality shared by all the expert real estate brokers who took the witness stand for the government and for the taxpayers.

The distillate of the government's position is this: Taking the highest valuation placed on the land by plaintiff's witnesses of $59,200 and breaking it down into $600 as the lowest value placed on the disputed rear 14 acres leaves $2,000 per acre on the front acreage.[8] Figuring the front acreage at 30 acres, this would produce a value of $8,400 and $60,000 respectively, or a total of $68,400. This averages $1,503 for the 45.5 acres. Adding the average value placed on the improvements of $16,575 produces a total fair market value of $84,975.

Now, the government argues, considering the location of Rokeby with respect to surrounding properties, neighbors, schools, transportation, water, sewer, and electric utilities of metropolitan Wilmington and from the analysis of other properties, not entirely comparable to Rokeby, but generally valued at a price per acre higher than that placed by plaintiffs' witnesses on Rokeby, there should be a fair market value on Rokeby, as of December 31, 1956, of not less than $86,000.

I must approach the conflict of opinion of the experts on real estate, contiguous to the *locus in quo*, so as to fix a valuation of land and buildings, for gift-tax purposes.

The opinion of the Court includes, also, the basic findings of fact that approximately 23 acres of the disputed land is level. It is suitable for development and the construction of single residences.[9] The rear portion of the land, consisting of approximately 22 acres, has a steep slope but is unsuitable for housing development purposes.[10] This portion of the land is rough and is composed of rock and boulders of Brandywine granite.[11] As stated, this land is not susceptible of development for housing purposes, except at great expense, by reason of the cost of house construction, expense of roads, sewers and cellars.[12] Mr. Cunningham, the principal government witness, found 14 acres in the rear portion of the property by scaling a drawing taken from deed records.[13] He, nevertheless, admitted the rear portion is not desirable for speculative development.[14] At the date of gift the real estate market for development purposes was not good.[15] No sales were made for development purposes in the area around Rokeby in 1951.[16]

In 1951 the Holliday property at Greenville and the West Farm property at the intersection of Kennett Pike and Kirk Road were on the market. These lands could not be and were not sold to any commercial developer. In fact, they were sold to individual purchasers at retail. It was necessary for the owners of West Farm to develop the property by constructing roads and bringing water into the property.[17] The Greenville property consisted of 19½ acres and was sold for $26,000 for individual development by the purchasers.[18] Water and sewers had been run to the Green-

8. R. 105.

9. R. 17, 44, 57.

10. Kurtz Dep. 8, 24, 25, 32, 47; R. 58, 76, 78.

11. R. 35; Kurtz Dep. 41.

12. Kurtz Dep. 25, 32, 47.

13. R. 107.

14. R. 126.

15. R. 14, 63; Kurtz Dep. 21.

16. R. 63.

17. R. 8, 36, 55, 57; Kurtz Dep. 10, 12.

18. R. 8.

ville property during 1951.[19] Cunningham had the Greenville property for sale for some months. He testified it could not be sold because there was no water available and builders were not interested.[20] Nevertheless, water was then being run to the Alexis I. duPont Elementary School and became available to the Greenville and West Farm properties.[21]

Opinions of plaintiffs' witnesses were based upon sales of property comparable to Rokeby. The nearest comparable properties were the Greenville and West Farm tracts.[22] Among other comparable properties was the Wilmington Country Club property, which was purchased in May, 1952, for $1,300 per acre.[23] The Thompson property has been on the market for several years. It could not be sold at $1,500 per acre. It was finally disposed of at retail to various purchasers in lots of 3½ acres.[24] In September, 1952, the Hoopes sale to Echols of 18 acres was at $830 per acre.[25] In March, 1953, 30 acres of the Hoopes property were sold to Cunningham at $750 an acre.[26]

Other comparable properties referred to by plaintiffs' witnesses were the Rupert property,[27] the Hallock duPont property,[28] the sale of the Archibald duPont land,[29] Sedgely Farms,[30] duPont's sale to Townsend at Guyencourt,[31] and Ashland Farm.[32]

The fair market value of Rokeby on December 31, 1951, as fixed by the appraisals of the several witnesses for plaintiffs, are:

Frederick W. Kurtz — $75,930
(Kurtz Dep. 8)

D. Daniel Martella — $65,900
(R. 7)

Paul S. Wiley — $69,600
(R. 35)

Joseph A. Wheelock — $75,200
(R. 51)

Defendant's witness, Porter, did not assume to base his valuation upon sales of comparable properties. His testimony was based upon the opinions which Worrall and Cunningham gave him. Worrall did business principally in Kennett Square, Pennsylvania. He was not active in the Wilmington area and Mr. Kurtz never knew him, in fact, to make an appraisal in the Wilmington, Delaware, area.[33] Moreover, defendant's witnesses referred to various properties, but admitted they were not comparable with Rokeby principally because they consisted of large estates with expensive houses constructed thereon. These were the Bridgewater, Valk and W. K. duPont properties.[34] For example, the Charles I. duPont property was not comparable and the sales price thereof did not represent a fair market price because of sentimental and other reasons.[35] Likewise, the Hallock duPont condemnation valuation contained certain elements of other damage and did not represent fair market value.[36]

Testimony of Cunningham, principal witness for the government, was speculative, indefinite and not based upon any actual sales of comparable properties.[37]

19. R. 25, 31, 192.

20. R. 117, 118.

21. R. 192.

22. R. 8, 57.

23. R. 36, 57; Kurtz Dep. 11.

24. R. 53.

25. R. 13.

26. R. 13.

27. R. 38.

28. R. 52.

29. R. 52.

30. R. 57.

31. Kurtz Dep. 14.

32. R. 10.

33. Kurtz Dep. 36, 37; R. 171–76; 177.

34. R. 119, 172.

35. R. 74, 172.

36. R. 175.

37. R. 82, 100.

Although Cunningham testified he was selling properties to dealers all the time,[38] he admitted he made no sales to speculative builders in 1951 in the Rokeby area.[39] For example, the Greenville property was listed with him in 1951.[40] But, he did not sell it. He admitted the Greenville and West Farm properties were available[41] but he stated they could not be sold because of lack of water and sewers.[42] Cunningham's testimony disclosed he merely 'scaled from a plat made from the deed to the property and divided the property into two portions: the front part of which he said consists of 30 acres susceptible of development, and the remaining portion at the rear of 14 acres. His plan of proposed development was to divide the front portion into lots of 100 feet by 225 feet, which he stated could be sold for $1,500 per lot.[43] A lot 100 feet by 225 feet comprises slightly over one-half an acre. His speculation, therefore, valued the land alone at nearly twice the highest value per acre placed upon the property by any of plaintiffs' witnesses. For example, Wiley valued the 24 front acres at $1,750 per acre,[44] which was the highest value per acre placed upon the property by any of plaintiffs' witnesses. Cunningham, on the other hand, theorized the optimum use of the land would have been for development of small houses. He testified the cost of bringing water and sewers into the property and other contingencies would amount to $2,250 per lot, making a total cost of $3,750 per lot. Yet, when called upon to give more definite figures, he acknowledged there would be required 2,600 feet of roadway at $20 per foot, 2,600 feet of water lines at $8 per foot, 2,600 feet of sewers at $8 per foot, 400 feet of water lines to bring the water

from the Kennett Pike to the property at $8 a foot, and a similar 400 foot line for sewers at $8 per foot to bring the sewers to the property. Admittedly this would amount to a total development cost of $102,000 which, added to the $99,000 which he stated the bare land could be sold for, makes a total of *$201,000.* He then claimed to be able to obtain 52 lots in the front portion of the property. By dividing the over-all cost of $201,000 by 52 the land and development costs would amount to $3,865 per lot. This obviously fails to take into consideration the expenses which the buyer would be put to in the way of financing and interest charges, carrying costs, taxes and other unforeseeable items.[45]

In fact, in dealing with the rear portion of the property Cunningham (government's key witness) was even more speculative. Notwithstanding all witnesses for plaintiffs testified the rear portion was not susceptible of economical development, Cunningham, however, claimed he could find 14 lots of 1 acre each which could be sold for $1,500 per lot.[46] This was speculative fantasy, not reality.

The evidence shows he had not studied the road frontage in this portion. He thought the roads could be worked out at a cost to justify $1,500 per acre for the land.[47] He admitted 5 to 7 lots would have to be engineered or juggled around. He thought 6 to 8 of the lots were practically in the same circumstances as the front part. He also acknowledged it would not be desirable from a developer's standpoint to purchase the rear portion separately from the front portion.[48] Moreover, he did not speak of the difficulties of bringing sewers and water into the granite rock

38. R. 109.
39. R. 132.
40. R. 117.
41. R. 110.
42. R. 118.
43. R. 113.

44. R. 44.
45. R. 131, 132.
46. R. 106.
47. R. 125.
48. R. 126.

area in the rear of the property. In truth, he had made no studies as to how the roads could be run into the property. In addition, he did not assume, in any of his testimony to support his opinion, the facts by the sales of comparable properties within miles of the area in question. He referred to the Wood-brook property, but admitted this was fully developed, with water, sewers, etc.,[49] and that the lots were sold at retail.[50]

 After an analysis and an evaluation of all the evidence, both by testimony and documentary proofs, I conclude the expert testimony of the witness Joseph A. Wheelock strikes at the center of the target. The estimate of the taxpayers for gift purposes was a $60,000 valuation. The Wheelock estimate of valuation fits exactly the District Director's second deficiency report of November 18, 1954, increasing the valuation of Rokeby to $75,200 upon which valuation plaintiffs paid the additional gift tax. I find no factual support for the further report of the District Director of January 20, 1955, increasing the valuation of Rokeby to $120,000. It has no basis in fact under the evidence. The factual conclusion, therefore, is: the fair market value of the gift-property on the date of the gift was $75,200. After making this master fact finding, I conclude

### As a Matter of Law

1. The property-gift, at its date, must be determined for its then present value.[51]

2. Establishment of value of such property on a fixed date, absent a showing of sales prices of comparable properties by the government, places doubt on the weight to be given to the government's ·expert testimony.[52]

 3. As stated by the foregoing memorandum and findings, opinions of witnesses cannot be accepted as proven facts. Such opinion evidence must be evaluated in accordance with the soundness and reality of the reasoning disclosed.[53]

4. Plaintiffs in the consolidated cases are entitled to recover from the government any taxes they paid, for gift purposes, on a valuation of the real property and dwellings, situate as aforesaid, in excess of $75,200, together with interest from July 6, 1955, at the statutory rate.

An order may be submitted containing the exact arithmetical computation to which plaintiffs are entitled by a judgment in their favor.

49. R. 113.

50. R. 124.

51. 1939 Code, § 1005, 26 U.S.C. § 1005; Regulation 108, § 86.19.

52. Elmhurst Cemetery Company of Joliet v. Commissioner of Internal Revenue, 300 U.S. 37, 39, 57 S.Ct. 324, 81 L.Ed. 491; Carlton v. Commissioner of Internal Revenue, 5 Cir., 190 F.2d 183.

53. Blumenthal v. Commissioner of Internal Revenue, 21 B.T.A. 901, 903; First National Bank of Birmingham v. Commissioner of Internal Revenue, 29 B.T.A. 352, 354.