William Black v. Commissioner.
Black v. Commissioner
Docket No. 6293-66.
United States Tax Court
T.C. Memo 1968-247; 1968 Tax Ct. Memo LEXIS 53; 27 T.C.M. (CCH) 1308; T.C.M. (RIA) 68247; October 28, 1968, Filed. Harry Geist, 341 Madison Ave., New York, N. Y., for the petitioner. John K. Antholis, for the respondent. FEATHERSTON
FEATHERSTON, Judge: Respondent, by notice dated October 21, 1966, determined a deficiency in petitioner's 1962 gift tax in the amount of $8,206.14. The sole issue presented for decision is what was the value, under section 2512(a), Internal Revenue Code of 1954, [1] of a residence given by petitioner to his wife in 1962. Findings of Fact Some of the facts have been stipulated and are so found. The stipulations and exhibits thereto are incorporated herein by this reference. William Black (hereinafter *54 referred to as "petitioner") was a legal resident of New Rochelle, New York, at the time of the filing of the petition herein. Petitioner filed a gift tax return for the calendar year 1962 with the district director of internal revenue for the Manhattan District of New York, New York. On May 5, 1955, petitioner and his former wife purchased the real property known as "Bon Repos" from Thomas Manville, Jr., for $85,000. Soon thereafter, at a cost of at least $75,000, petitioner made a number of improvements to the property, including installation of a swimming pool and a tennis court; modernization of the kitchen; renovation of the air conditioning equipment; and general redecoration of the house. On or about June 14, 1962, petitioner made a gift of Bon Repos to his present wife, and 1309 in his gift tax return for 1962 he reported the value of Bon Repos as $115,000. Petitioner now contends that the property had a fair market value of $110,000 on the date of the gift. Respondent determined that the value of the gift on that date was $175,000. A. The Area Bon Repos is located at Premium Point, a private residential park lying partly in the Town of Mamaroneck and partly in *55 the City of New Rochelle, in Westchester County, New York. The portion in Mamaroneck consists of a peninsula fronting on Long Island Sound and backing on Premium Mill Pond and Echo Bay, and it is connected to the New Rochelle portion via a causeway. The peninsula, on which Bon Repos is located, is considered the more exclusive part of Premium Point. The zoning requirements restrict construction to one-family residences on plots having a minimum area of 30,000 square feet. The only vehicular access to Premium Point is by a private road. All of the property owners are members and stockholders in the Premium Point Association, Inc. The Association levies an annual tax for the purpose of maintaining 24-hour police guards at the entrance; constructing and maintaining all the roadways, which are private; collecting refuse; maintaining two docks located on the peninsula; and cleaning septic tanks, as there are no public sanitary sewers. In addition, the Association provides a private beach for the residents. Echo Bay is a good sized, navigable, and very busy harbor with some private homes, a sewage disposal plant, a public beach, some islands, several industrial plants, and the two docks *56 on the peninsula. All of the shore line of Premium Point is high and rocky both on the Sound and on the Bay and Mill Pond sides. Practically all of the shore clubs and many residents have installed swimming pools. B. The Land Bon Repos encompasses 2.37 acres of land, fronting along the shores of Long Island Sound for between 550 feet and 575 feet. The estate also possesses riparian rights covering an area of approximately 1 3/4 acres. The property is generally level and is beautifully landscaped with attractive shrubbery and plantings, a lawn in very good condition, and many walks. There is a twofoot stone wall along the perimeter lines of the property and a stone seawall extends along the rocky Long Island Sound shore frontage. Bon Repos enjoys panoramic views of Long Island Sound and portions of Echo Bay. C. The Improvements The improvements consist of the main residence; two detached garages, one with a servants' wing and the other with a guest apartment on the second floor; a tennis court; a swimming pool; and a cabana. The main residence was built in 1905, but its age appears to be circa 1930. It has 12 rooms, five baths, two lavatories, and a playroom in the basement, *57 and contains 109,475 cubic feet. The first floor contains an entrance hall with a large guest closet and a large powder room, a spacious living room with a fireplace and a picture window overlooking the Sound, a library with a small fireplace, a sun porch with a picture window and sliding glass doors opening onto the patio around the swimming pool, and a large paneled dining room with a fireplace, a picture window, and an entrance onto a terrace. In addition, there are a very large kitchen which has been recently modernized throughout, two maids' room with a modern bath, and a sizable laundry and storage room. The second floor has a long hallway; a master suite consisting of a double bedroom, a dressing room, an open porch, two baths, and a refrigerator; two double bedrooms each with a bath; and a guest bedroom with a bath. In addition, there are two walk-in storage rooms. The third floor is a completely open storage area. The basement consists of a paneled family room which has a lavatory and a fireplace, a large storage area, a room housing the air conditioning equipment, and a large furnace room. The air conditioning system services only the main quarters of the residence, the *58 servants' quarters being equipped with window air conditioners. The entire house in 1962 was in a good state of maintenance, repair, and upkeep. The garage and servants' quarters, containing 33,658 cubic feet, fairly match the main residence in architecture. The front portion, with space for four cars, was erected in 1905 and the rear wing in 1939. The living quarters consist of a living room and a kitchen downstairs, and a very large paneled bedroom with large picture windows, a bath, and storage area upstairs. 1310 The other garage, also simulating the structure of the main house, consists of a two-story building, erected in 1940, containing 32,315 cubic feet. The first floor is a garage accommodating three automobiles. The air-conditioned living quarters on the second floor, consisting of a living room with a large picture window, two twin-size bedrooms, a small modern kitchen, and a bath, are attractively designed with good quality structural details. Both garage buildings are in very good condition. On the southerly side of the main residence is a 90-foot by 23-foot reinforced concrete swimming pool, with a concrete apron surrounding it. The pool was installed by *59 petitioner in 1955 at a cost of $20,000. Next to the pool is a frame cabana with dressing rooms and showers. At the western tip of the property is a standardsize tennis court, constructed by petitioner in 1955 at a cost of $5,000 to $6,000, enclosed in a 10-foot fence. The brick dust surface makes the court playable even after rain. Adjoining the subject property to the east is the estate of Charles Revson. Revson purchased it in 1960, two years after the previous owner had acquired it. The record does not disclose any other sales of improved property in Premium Point between 1956 and 1965, more than three years after the date of the gift in question. In other areas of Westchester, however, there were numerous sales of expensive waterfront properties during this time period. Between May 1960 and June 1961, the following sales of unimproved property in Premium Point also took place: (1) 2.187 acres and foundation to J. Weiler for $31,000; (2) 1.42 acres to Denniston for $20,000; and (3) 2.137 acres and foundation to M. Love for $30,000. All three of these properties are located just across the causeway from Bon Repos, fronting on Mill Pond rather than on Long Island Sound, and, *60 therefore, are not as desirable as Bon Repos. Ultimate Finding of Fact The value of Bon Repos on June 14, 1962, was $150,000. Opinion On June 14, 1962, petitioner made a gift of his home, Bon Repos, to his wife. Bon Repos is located in an exclusive section of Westchester County, New York, known as Premium Point. It consists of 2.37 acres of beautifully landscaped land, fronting on Long Island Sound, upon which are located a main residence with 12 rooms, five baths, two lavatories, and a playroom; a four-car garage with servants' quarters; a three-car garage with a two-bedroom air-conditioned guest apartment; a tennis court; a large swimming pool; and a frame cabana located near the swimming pool. The sole issue for our determination is the value of Bon Repos as of the date of the gift. The valuation of taxable gifts of property is governed by section 2512(a), which provides that "[if] the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift." Accordingly, we must exercise our judgment as to the price at which, on the date of the gift, Bon Repos would have changed hands "between a willing buyer and a willing seller, *61 neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts." Sec. 25.2512-1, Estate and Gift Tax Regs. [2]
Petitioner purchased Bon Repos in 1955 for $85,000 and shortly thereafter expended at least $75,000 in making improvements. Petitioner contends that Bon Repos had a fair market value of $110,000 on the date of the gift. [3] Respondent determined, and here contends, that the property had a value *62 of $175,000. Both parties presented the expert testimony of well qualified witnesses to support their respective contentions. We have found as an ultimate fact that the value of the property on the gift date was $150,000. Both petitioner's expert witness, Scott, and one of respondent's expert witnesses, Broadman, appraised the land at a value of 1311 about $30,000 per acre. While respondent's other expert witness, Lane, valued the land at $35,000 per acre, the lower appraisal seems to be more reasonable, especially when considered in light of the land sales detailed in our findings. It is our conclusion that the fair market value of the land on the date of the gift was $30,000 per acre, or a total of $70,000. Valuation of the buildings and other improvements on Bon Repos is a more difficult task, and the disagreement between the parties and their experts is much broader here. The expert testimony of respondent's witnesses emphasized replacement costs, *63 computed through use of the Dow Building Cost Calculator and Valuation Guide to be $1.80 per cubic foot. [4] Broadman multiplied this figure by 100,000 cubic feet, finding a replacement cost of $180,000; Lane used 109,475 cubic feet and found a replacement cost of $197,000. These sums were then discounted (50 percent by Broadman and 75 percent by Lane) to reflect obsolescence and depreciation. To the cost so computed ($90,000 and about $50,000, respectively) were added the individually estimated replacement costs of the two garages and apartments, swimming pool, tennis court, seawall, and other features. Although replacement costs may be indicative of value in some situations, see, e.g., Clinton Cotton Mills v. Commissioner, 78 F. 2d 292, 295 (C.A. 4, 1935), the utility *64 of a computation of such costs in placing a value on real estate as individualized as Bon Repos is limited. Cf. Tracy v. Commissioner, 53 F. 2d 575, 577 (C.A. 6, 1931), affirming 15 B.T.A. 1107 (1929), certiorari denied 287 U.S. 632 (1932). We are not here dealing with an efficiently planned and coordinated development of real property, and undue emphasis on individual replacement costs obscures the fact that it is the property as a unit, not the component elements, that is to be valued. The main residence was built in 1905. Although it has been subsequently modernized from time to time, its architecture is representative of an earlier period. The entire third floor of the main house is an open storage area, yet is included in the volume for purposes of the Dow Calculator computations. The garage facilities for seven cars and the overhead apartments are not products of plans to meet the needs of a hypothetical willing purchaser; indeed, one of the garages reflects the sports car enthusiasm of a former owner, the late Thomas Manville, Jr. Moreover, choosing an appropriate depreciation-obsolescence discount factor to apply to the Dow Calculator *65 replacement costs is almost as difficult as finding the fair market value of the estate. Thus, the determination of the replacement costs is, to a large extent, subjective and lacks the mathematical certainty respondent would have us attribute to it. The Dow Calculator figures can serve as no more than an extremely rough guide, or, in the words of one of the witnesses, "an upper limit of value." [5]
We believe that a comparision of the value of similar properties located in the same area as Bon Repos, the "market approach," supports our ultimate finding of a gift date value of $150,000. Useful for comparison with Bon Repos are the Perlman and Revson properties. The Perlman estate adjoins the property immediately to the east of Bon Repos. The plot is smaller than that of Bon Repos, 1.25 acres, but the main house is approximately the same size, *66 and, the expert witnesses agree, is superior to that of Bon Repos. The main house was constructed 20 years later than the main house at Bon Repos. In addition to the main house, there is also a swimming pool and a three-car garage on the property. Perlman purchased the property in 1955 for $110,000, a figure $25,000 higher than the price paid by petitioner for Bon Repos in the same year. However, petitioner's addition of a swimming pool, shortly after his purchase, at a cost of $20,000, brings the total cost of the two properties in 1955 to approximately the same figure. As did petitioner, Perlman made improvements to the property after his purchase, including the installation of a new kitchen. Both of respondent's expert witnesses testified that they felt the Perlman property to be worth approximately $148,000. at the date of the gift of Bon Repos. This valuation may be slightly high, in light of the fact that when Perlman offered the 1312 property for sale in 1963 at a price of $150,000 no buyer made an offer. Yet, using this figure as an upper limit, and noting the almost identical values of Bon Repos and the Perlman property in 1955 and the slightly greater improvements made *67 to Bon Repos between 1955 and 1962, it is reasonable to conclude that Bon Repos had a value of approximately $150,000 on the date of the gift. The other property which may be compared to Bon Repos is the Revson estate, immediately adjoining Bon Repos. The Revson plot is slightly larger than Bon Repos, and the main house is substantially larger, although less attractive. Revson purchased this property in 1960 for a price of $125,000, which included $30,000 for the furniture contained in the house. Although the price for the furniture may have been somewhat inflated, and although the house is inferior to that of Bon Repos, the price paid for the Revson property in 1960 lends some support to our gift date valuation of $150,000 for Bon Repos. Respondent contends that an analysis of the market in Premium Point from 1950 to 1962 indicates that real estate values in that area increased at an overall rate of 5 percent per annum. Even if this contention is sound, it does not materially advance us toward resolution of the issue before us. We are not advised how the alleged increase treats improvements made to the properties and almost one-half of petitioner's investment in Bon Repos was *68 made through improvements. [6] Furthermore, even if a trend of increasing real estate values did exist, we are here concerned with the market conditions as of the valuation date; the evidence shows that at that time a tight mortgage market existed, and we may judicially notice that a severe decline in the stock market had just occurred. We also observe that no sales of improved property in Premium Point took place for two years before, and three years after, the making of the gift. In summary, our ultimate finding of the fair market value of Bon Repos on the date of the gift is based on a consideration of all the relevant testimony, stipulations, and exhibits. We do not attempt to state in detail the weight given to each factor. However, after due consideration to the market approach, and taking account, inter alia, of the replacement cost approach, the price paid by petitioner for Bon Repos in 1955 ($85,000), the improvements *69 made by petitioner (costing at least $75,000 in 1955), the age and depreciation of the main house and the other improvements, the location of the premises, and the state of the real estate market in June 1962, as well as the testimony of the expert witnesses for both parties, it is our conclusion that the value of Bon Repos at the date of the gift was $150,000. Decision will be entered under Rule 50. Footnotes
1. All section references are to the I.R.C. of 1954, as amended, unless otherwise noted.↩
2. Sec. 25.2512-1 Valuation of property; in general. * * * The value of the property is the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of relevant facts. The value of a particular item of property is not the price that a forced sale of the property would produce. Nor is the fair market value of an item of property the sale price in a market other than that in which such item is most commonly sold to the public, taking into account the location of the item wherever appropriate. * * * All relevant facts and elements of value as of the time of the gift shall be considered. * * * [Emphasis added.]↩
3. Although petitioner reported the value of Bon Repos as $115,000 on his gift tax return, he is not concluded by that figure. Union Nat. Bank of Pittsburgh v. Driscoll, 32 F. Supp. 661, 662↩ (W.D. Pa. 1940).
4. The Dow Building Cost Calculator and Valuation Guide is a manual used in the real estate industry to determine the replacement costs of structures. The Dow Calculator lists the base cost for many types of structures. The base cost is then multiplied by a "local cost multiplier" (which is first adjusted to reflect the "historical local cost index") to produce the replacement cost per cubic foot.↩
5. It is appropriate to note that adding the value of the land, $70,000, to respondent's witness Lane's appraisal of the separately valued house and other improvements under the replacement cost approach (excluding the superfluous garage), $86,750, results in a figure which is quite close to our ultimate finding of a value of $150,000.↩
6. It should be observed that many of the improvements made to a property such as Bon Repos may represent the personal tastes of the builder and, although they may add substantially to its cost, they do not necessarily add to its value to a prospective purchaser.↩