JACK GOTTLIEB and EDYTHE GOTTLIEB, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent AARON GOTTLIEB, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gottlieb v. Commissioner
Docket Nos. 4961-71, 4967-71.
United States Tax Court
T.C. Memo 1974-178; 1974 Tax Ct. Memo LEXIS 144; 33 T.C.M. (CCH) 765; T.C.M. (RIA) 74178; June 27, 1974, Filed. *144 Petitioners received an apartment building located in a deteriorating area of Brooklyn as a distribution in liquidation of a corporation. Held, fair market value of the apartment building determined. Sidney Gelfand and Wallace Musoff, for the petitioners. *145 Stanley J. Goldberg, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: For their 1968 taxable years, the respondent determined deficiencies of $6,273.21 in the Federal income tax of the petitioners Jack and Edythe Gottlieb and $6,546.81 in the Federal income tax of the petitioner Aaron Gottlieb. The only issue for decision is the fair market value, as of July 1, 1968, of an apartment building located in Brooklyn, New York. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Jack and Edythe Gottlieb, are husband and wife, who maintained their legal residence in Kings Point, New York, at the time their petition was filed in this case. They filed their joint Federal income tax return for the year 1968 with the district director of internal revenue, Brooklyn, New York. The petitioner, Aaron Gottlieb, maintained his residence in Brooklyn, New York, at the time his petition was filed in this case. He filed his individual Federal income tax return for the year 1968 with the district director of internal revenue, Brooklyn, New York. Jack Gottlieb and Aaron Gottlieb will be *146 referred to as the petitioners. The petitioners were the sole shareholders of Arley Holding Corporation (the corporation) at the time of its liquidation on or about July 1, 1968. As of that date, Aaron Gottlieb owned 51 percent of the stock in the corporation and had an adjusted cost basis in his holdings of $2,550, and Jack Gottlieb owned 49 percent of the stock and had an adjusted cost basis in such holdings of $2,450. Both petitioners owned such stock for more than 6 months at the time of liquidation. The assets distributed to the petitioners as part of the liquidation included an apartment building at 546 Midwood Street, Brooklyn, New York (the Midwood property). That property was located in an area of Brooklyn where the neighborhood of Crown Heights merges into the neighborhoods of Flatbush and East Flatbush. It was a few blocks north of the medical center comprised of Kings County Hospital and Downstate Medical School. On the other side of Crown Heights were located the areas of Bedford-Stuyvesant and Brownsville, in which crime was rampant, many houses and apartment buildings had been abandoned, and the only residents were families of low income. In 1968, such conditions *147 were spreading to the Crown Heights area. However, they had not yet affected the immediate area of the Midwood property, where the residents were of a more moderate income level. Nonetheless, the immediate area of the Midwood property was experiencing a change in its demographic composition akin to the change in the demographic composition of the areas of Flatbush and East Flatbush. Such change was accompanied by a slow decline in the value and physical condition of property. Money from conventional institutional sources with which to finance the purchase of real estate in the area surrounding the Midwood property was difficult to obtain in 1968. Jack Gottlieb was in the business of managing real estate. Among the buildings which he owned or managed were a number that had their mortgages mature, some with principal outstanding, during the period 1966 through 1968. The buildings were located in the Bedford-Stuyvesant, Brownsville, Crown Heights, and Brighton Beach areas of Brooklyn, and included the Midwood property. In 1966, the outstanding mortgage principal on the building in Brownsville was paid in full, and in 1968, the mortgage on the Midwood property expired with its *148 principal fully paid. A new mortgage was not obtained. In 1968 and 1969, the mortgages on the other properties in Bedford-Stuyvesant and Crown Heights were extended, not for a specific period of time, but as demand loans at interest rates of 8, 8-1/2, and 9 percent. On the other hand, the mortgage on the property located in Brighton Beach was extended for a period of 5 years at an interest rate of 7-1/2 percent. Unlike the others, that building was located a number of miles across Brooklyn from the Midwood property and was in a stable, middle-class neighborhood. However, financing was not impossible to obtain in Crown Heights, Flatbush, and East Flatbush, and at least one major bank was extending financing in certain limited situations as part of a package arrangement it had with an independent mortgage company. The prime interest rate charged to preferred borrowers for short-term or demand loans by the Chemical Bank as of July 1, 1968, was 6-1/2 percent. The building on the Midwood property was a 4-story walk-up with red brick facade and external fire escapes. It contained 41 apartments, 130 rooms, and 1 store. There were coin-operated laundry machines in the basement. *149 The vestibule and lobby entrance doors were of metal frame and glass panel. The vestibule and lobby floors were tile covered, and the walls and ceilings were plastered and painted. There was a bell system in the vestibule, and 2 wall recessed mail boxes in the lobby. The building was divided into 2 wings, with separate stairways and corridors in each. The stairways were of steel construction with tile-covered steps. The corridor floors were tile covered, and the walls and ceilings were plastered and painted. Heat was supplied by an oil-fired boiler, with submerged coils for hot water supply. The window frames were made of wood and were double hung. Each apartment had cast iron radiators. The kitchens contained combination sinks, wood cabinets, gas ranges, and electric regrigerators. The bathrooms contained semi-modern fixtures, ceramic tile floors, and half-tiled walls. The property was without conventional incinerator chutes in the corridors. In 1968, the building had an estimated useful life of 20 years, and at the time of trial, it was in fair to good condition. The annual rent roll for the apartment building, including income from washing machines, as of July 1, 1968, was *150 $36,907.08, and the following table sets forth the actual rental income and operating expenses for the calendar year 1967 and the first 6 months of 1968: 546 MIDWOOD STREET Schedule of Rent Income and Operating Expenses
1967
Jan. 1 - June 30, 1968
Rent income
$35,926
$17,653
Washing machine 180 105
Total income
$36,106
$17,758
Operating expenses
Wages
$ 2,760
$ 1,320
Repairs
Painting
$1,232
$1,035
Plumbing
757
113
Stove & refrigerator
87
53
Cement & tile
232
--
Misc.
904
748
Supplies 780 113
3,992
2,062
Taxes
Real Estate
$8,224
$3,963
Water & sewer
1,184
1,184
Permits
50
--
Payroll 71 --
9,529
5,147
Fuel
2,071
1,174
Management fees
2,147
1,379
Light & pwer
527
294
Insurance
807
423
Union welfare
163
--
Telephone
52
40
Exterminator & rubbish removal
90
42
Legal
1,248
--
Audit
475
--
Misc. 164 212 $24,025 $12,093
Profit Before Depreciation $12,081 $ 5,665
In determining the gain realized *151 on liquidation of the corporation, the petitioners placed a value of $100,000 on the Midwood property. In his notices of deficiency, the respondent determined that the fair market value of such property was $150,000. OPINION As the shareholders of the corporation, the petitioners are taxable on any gain realized by them as a result of the distributions which they received on the dissolution of the corporation. Sec. 331, Internal Revenue Code of 1954; sec. 1.331-1(a), Income Tax Regs. In computing such gain, they must include the fair market value of the Midwood property. Robert J. Boudreau, 45 B.T.A. 390 (1941), affd. 134 F.2d 360 (C.A. 5, 1943); Anna L. Dirksen, Executrix, 24 B.T.A. 1152 (1931). In view of the dispute over the fair market value of such property, we must determine its value. The term "fair market value" has been defined as the price at which property would change hands in a transaction *152 between a willing buyer and a willing seller, neither being under a compulsion to buy or sell and both being reasonably informed as to all relevant facts. Alvary v. United States, 302 F.2d 790 (C.A. 2, 1962); Estate of Daniel Guggenheim, 39 B.T.A. 251 (1939), modified 117 F.2d 469 (C.A. 2, 19741), cert. denied 314 U.S. 621 (1941); see also sec. 1.170-1(c), Income Tax Regs.,; sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2512-1, Gift Tax Regs. The petitioners now contend that the Midwood property had a fair market value of $85,000 as of July 1, 1968, even though at the time of liquidation they placed a value of $100,000 on it. The respondent contends that the fair market value was at least $150,000. Both the petitioners and the respondent have relied substantially on the testimony of experts. The petitioner's expert, Samuel Simms, was an independent appraiser and a senior member of the American Society of Appraisers, who had many years of experience as a real estate broker and appraiser. He arrived at his expert opinion of value by capitalizing the anticipated net income of the Midwood property. *153 He began with the actual rent roll as of July 1, 1968, which amounted to $36,907, and from that, subtracted slightly over 2 percent for contingencies, such as vacancies and noncollection of rent. He thus arrived at a net annual rent of $36,025. From that, he subtracted estimated operating expenses in the following amounts: Estimated Operating Expenses Real estate taxes
$ 8,693
Water & sewer tax
1,200
Electricity & gas
700
Heat
2,100
Payroll & benefits
3,000
Painting
1,500
Repairs
2,400
Stoves & refrigerator
300
Legal & accounting
400
Supplies
400
Miscellaneous
500
Insurance
1,200
Management 2,200
Total
$24,593
From such calculations, he arrived at an estimated annual profit of $11,432. Mr. Simms capitalized his estimated profit at the rate of 13.5 percent. Such capitalization rate included an expected yield of 9 percent plus depreciation of the building of 4.5 percent. Mr. Simms felt that a 9-percent yield was necessary because the property was in Crown Heights, which he considered to be a high-crime area, and because he believed that mortgage money was unavailable to finance purchases of real property as a result of the deteriorating *154 condition of the neighborhood. Accordingly, he felt that the market for the apartment building was depressed. Mr. Simms arrived at a depreciation rate of 4.5 percent by determining that the remaining useful life of the building was 20 years as of July 1, 1968, and by allocating almost 90 percent of the value of the property to the building. He was of the opinion that the land had a minimum value of $1 per square foot. He determined that the Midwood property, at most, was worth $85,000. The respondent's expert, Harold Broadman, was an appraiser in the employ of the Internal Revenue Service, who had been employed in that position for a number of years, who had previously been a staff appraiser for the Federal Housing Administration, and who had appraised many different types of real estate. It was his expert opinion that the Midwood property had a fair market value of $165,000 as of the date in issue. He arrived at his valuation by reference to sales of property which he deemed to be comparable, the cost of reproducing the apartment building combined with the value of the land, and by capitalizing the anticipated earnings. The first of the 4 sales referred to by Mr. Broadman *155 was of an apartment building located at 456 Linden Boulevard, which was approximately 6 blocks south of the Midwood property, and on the other side of Kings County Hospital. It was a 4-story brick apartment house that stood on a 4,000-square-foot lot. It contained 16 apartments and 55 rooms and was sold in April 1967 for $93,263. Of that amount, apparently $19,000 was paid in cash, a purchase-money mortgage of $22,000 was taken back by the seller, and the property itself was subject to a mortgage of $52,263. The annual gross rent of the building was $14,266. At the time of trial, the building was in fair to good condition. The second sale was of an apartment building located at 1452 Carroll Street, approximately 7 blocks north of the Midwood property. It was a 4-story brick apartment building, which had 27 apartments and 96 rooms. It stood on a 9,144-square-foot lot and was sold in July 1967 for $122,717. Of that amount, $16,375 was apparently paid in cash, a purchase-money mortgage of $11,125 was taken back by the seller, and the purchaser assumed mortgages of $28,907 and $66,310. The annual gross rent of the property was $26,975, and at the time of trial, the building *156 was in fair condition. The third sale of property which Mr. Broadman considered comparable was one of an apartment building located at 212 Crown Street, approximately 1 mile northwest of the Midwood property. It was a 4-1/2-story brick apartment building, with 5 stores, 44 apartments, and 138 rooms, and stood on a 10,700-square-foot lot. According to Mr. Broadman, it was sold in August 1967 for $222,125. Of that amount, he indicated that $45,000 was paid in cash, and the property was subject to mortgages of $120,625 and $56,500. The annual gross rent of that apartment building was $45,044. At the time of trial, the building was in poor condition. The fourth sale of property which Mr. Broadman referred to was an apartment building located at 332 Rutland Road, approximately 3 blocks from the Midwood property. It was a 4-story brick structure of 46 rooms and 20 apartments. It stood on a 4,000-square-foot lot, and he testified that it was sold in August 1968 for $80,132. Of that amount, he testified that $17,391 was paid in cash, a purchase-money mortgage of $13,609 was taken back by the seller, and a mortgage of $49,432 was assumed by the purchaser. The annual gross rent *157 generated by the building was $17,607. At the time of trial, the building was in fair condition. Based on such sales, Mr. Broadman made 3 calculations to determine the fair market value of the Midwood property.He initially determined that the average cost per square foot of land with improvements was $19.37, and when he applied that figure to the Midwood property, he arrived at a value of $174,300.00. He next determined that the average ratio of sales price to assessed value was 1.18 to 1.00, and when he applied that ratio to the assessed value of the Midwood property, which he considered to be $165,000.00, he found a value of $194,700.00. Finally, he determined that the average ratio of sales price to gross rent was 5.13 to 1.00, and using a gross rent figure of $35,925 for the Midwood property, he arrived at a fair market value of $184,295. Mr. Broadman then added the 3 figures, divided by 3, and arrived at a fair market value of $184,431 on the basis of comparative sales. Mr. Broadman next found a fair market value of $181,575 by using the replacement cost method. He estimated the size of the apartment building to be 337.5 cubic feet, and to that figure applied the appropriate *158 replacement cost per cubic foot as set forth in the Dow Building Cost Calculator and Valuation Guide. He arrived at a replacement cost for the structure of $354,375. He next determined that the building had a remaining useful life as of 1968 of 20 years, and that if new, it would have had a remaining useful life of 55 years. Accordingly, the amount of depreciation remaining as of 1968 was 36 percent, and he multiplied the replacement costs by 36 percent to arrive at a value for the structure of $127,575. To that he added the value of the land, which he determined to be $6 per square foot, or $54,000 for the whole, and arrived at a fair market value of $181,575 by reference to the replacement cost. Finally, Mr. Broadman valued the property by capitalizing its earnings. He determined that the annual gross rental income generated by the apartment building was $35,925. Mr. Broadman estimated the annual expenses of operating the apartment building to be $20,700 as follows: Estimated Annual Expenses Real estate & water tax
$ 9,408
Insurance
807
Heat & utilities
2,597
Reserve for repairs and miscellaneous
3,592
Help (not including apartment)
2,500
Management 1,796
Total expenses
$20,700
*159 Accordingly, he determined that the net annual profit on the apartment building was $15,225. To the net annual profit, Mr. Broadman applied a capitalization rate of 9.8 percent and arrived at a fair market value of $155,357. His rate of capitalization was comprised of a return on capital of 6.3 percent and depreciation of the structure of 3.5 percent. He was of the opinion that 6.3 percent return on capital was in line with the prime rate which he stated ranged from 6.00 to 6.75 percent in 1968. Moreover, he considered that such capitalization rate was in line with the average capitalization rate of the 4 properties he referred to as comparable, assuming the expenses of operating such properties amounted to approximately 55 to 60 percent of gross rents. Finally, he determined that the structure represented 70 percent of the value of the whole, and that its remaining useful life was 20 years. Accordingly, he concluded that a depreciation rate of 3.5 percent was warranted. After considering and weighing the testimony of the experts and the other evidence in the record, it is our conclusion, and we find, that the fair market value of the Midwood property was $100,000 on July 1, 1968. *160 Such property was valuable because it produced income through rentals. It had no intrinsic value other than salvage and the residual value of the land. New construction in the area was minimal, and the land was not in demand. Moreover, the sales of other apartment buildings which the respondent has brought to our attention are not comparable. In such circumstances, the capitalization of the earnings generated by the apartment building is the most suitable method of valuation. Jason L. Honigman, 55 T.C. 1067 (1971), affd. on this issue 466 F.2d 69 (C.A. 6, 1972); Huron Building Co., 15 B.T.A. 1107 (1929), affd. sub nom, Tracy v. Commissioner, 53 F.2d 575 (C.A. 6, 1931), cert. denied 287 U.S. 632 (1932). In our opinion, Mr. Simms' calculation of value on the basis of capitalizing earnings is more nearly correct, although we believe that some of his calculations resulted in understating the value of the property. Mr. Broadman's statement significantly understated some of the operating expenses. It was largely based on the actual expenses of operating the property in 1967. However, he admitted in his testimony *161 that the costs of insurance should exceed the amount he included for that purpose, and there is no satisfactory explanation as to why he included less than the actual expenses for management and for repairs, maintenance, and other miscellaneous items. On the other hand, the petitioners failed to provide a satisfactory explanation for the fact that they estimated taxes and the cost of fuel and utilities at more than $600 in excess of the actual expenses. In our judgment, the proper amount to be used as the estimated expenses is approximately $24,000. We agree with Mr. Simms that an adjustment should be made in the estimated income to take into consideration contingencies such as vacancies and problems of collection, and we conclude that a reasonable estimate for the annual profit is approximately $12,000. With respect to the proper rate of capitalization, the rate used by Mr. Simms was somewhat too high and the one used by Mr. Broadman was much too low. Mr. Broadman's yield of 6.3 percent was less than the prime rate, and considering the difficulty of securing financing on property in the neighborhood of the Midwood property, an investor would clearly demand more than the prime *162 rate on any such financing. Morevoer, Mr. Broadman's yield cannot be justified on the basis of the comparable sales which he considered, because we believe that he underestimated the ratio of operating expenses to income. Nor is the capitalization rate used by Mr. Broadman helped by the testimony of another expert who suggested a rate only slightly higher than Mr. Broadman's, because the computations proposed by that expert failed to provide for capital recovery. On the other hand, Mr. Simms' 9-percent yield is somewhat excessive. Conditions in the area of the Midwood property apparently had not deteriorated to the point they had reached in Bedford-Stuyvesant and Brownsville, and in the light of all the information in the record, we are satisfied that an 8-percent yield would be sufficient. In our opinion, a 4-percent rate would be adequate to cover the depreciation on the building. Both experts agreed on an estimated remaining life of 20 years. Mr. Broadman furnished no information to support his valuation of the land at $6 per square foot, which amounted to roughly 30 percent of the total value he determined, and we are convinced by Mr. Simms' testimony that such valuation *163 is excessive. However, Mr. Simms also failed to support his valuation of $1 per square foot, which amounted to roughly 10 percent of his determination of the value of the whole. In such circumstances and in light of testimony concerning the ratio used for assessment purposes, we conclude that the land represented 20 percent of the value of the property. Accordingly, we find that the appropriate capitalization rate was 12 percent, and the use of that rate results in a valuation of $100,000. The respondent's evidence as to value based on comparable sales ordinarily constitutes persuasive evidence of valuation. Cf. Carlton v. Commissioner, 190 F.2d 183 (C.A. 5, 1951), revg. in part a Memorandum Opinion of this Court; Buck v. United States, 154 F. Supp. 90 (D. Del. 1957); see, e.g., Elmhurst Cemetery Co. v. Commissioner, 300 U.S. 37, 39 (1937). [1] However, certain factors in the record lead us to conclude that, in the circumstances present herein, the sales relied on by Mr. Broadman are of little significance in placing a value on the Midwood property. *164 Apartment buildings are not fungible. One may have more or larger apartments, newer appliances in the kitchens, more modern bathrooms, or other tangible or intangible attributes that are missing in a second building. Accordingly, the sale of one is not always evidence of the fair market value of another. Huron Building Co., 15 B.T.A. at 1114.Care must be taken to see that the sales relied on are in fact of comparable properties. The sales referred to by Mr. Broadman were not comparable, even though such sales involved four-story apartment buildings within the general area of the Midwood property. Of the four such sales, three were of apartment buildings that had fewer rooms and apartments and two stood on substantially smaller lots. No mortgage existed on the Midwood property in 1968, and we have found as a fact that it was difficult to secure financing for the purchase of real estate in that area at that time. The comparable sales on which Mr. Broadman relied all included financing. In each, there was a mortgage which could be assumed by the purchaser, and in each, the seller took back a purchase-money mortgage for a part of the purchase price. Since the *165 Midwood property was not subject to a mortgage, any purchaser would have been required to furnish all cash, or the seller would have been required to accept a purchase-money mortgage for a part of the purchase price - probably for a large portion of it. For the seller to dispose of any such purchase-money mortgage, it might have been necessary for him to sell it at a substantial discount. Thus, the lack of readily available financing for any sale of the Midwood property would make it much more difficult to sell such property, considering the conditions then existing in Brooklyn, and would reduce significantly the amount that could be realized on any such sale. Moreover, 3 of Mr. Broadman's comparables occurred 10 months or more prior to July 1, 1968. Although such a time difference might not be significant in many situations, it is important in this situation because of the changes taking place in Brooklyn at that time. In judging the weight of the information concerning the comparable sales, we believe that these differences - especially the lack of financing on the Midwood property - considerably weaken such evidence. The petitioners vigorously argued for a low valuation *166 because of the alleged impossibility of securing financing for a sale of the Midwood property. We are convinced that securing such financing was difficult but not impossible. Although Mr. Jack Gottlieb testified that he was unable to secure a new mortgage on the property, we were not informed as to the conditions and terms on which he was requesting such financing. Mr. Simms admitted that he had actually made no inquiries about such financing, and there was evidence in the record that financing was available under some circumstances. Although the petitioners vehemently argued that the respondent's comparables were not in fact comparable, they failed to offer any evidence at the trial as to comparable sales, and their argument that there were no comparable sales was not convincing. Their argument about the difficulty of securing financing has convinced us to discount the weight to be given to the respondent's information based on comparable sales, but it has not convinced us to adopt a value lower than that arrived at by use of the income method. We have given little weight in our consideration to the method of valuation which involved cost of reproduction, adjusted for depreciation, *167 plus land value. The apartment building on the Midwood property was obsolete and uneconomical, and there is no dispute that it would not have been built in 1968. We think it unrealistic to determine fair market value by reference to the cost of reproduction when such structure would not have been reproduced. Ujvari v. United States, 212 F. Supp. 223 (S.D.N.Y. 1963). Decisions will be entered under Rule 155. Footnotes
1. See also, e.g., William Black, 27 T.C.M. 1308↩, 37 P.-H. Memo. T.C. par. 68,247 (1968).