**Arthur UJVARI and Tessie Ujvari, Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

United States District Court
S. D. New York.

Jan. 2, 1963.

Gabriel T. Pap, New York City, for plaintiffs.

Robert M. Morgenthau, U. S. Atty., Robert Arum, Asst. U. S. Atty., New York City, for defendant.

BICKS, District Judge.

This is a suit for the refund of personal federal income taxes paid by the plaintiffs, Arthur and Tessie Ujvari.

They claim that they are entitled under Sections 23(s) and 122(a), (d) (5) of the Internal Revenue Code of 1939 [1] to a deduction for a net operating loss carryover arising out of the confiscation by the Hungarian government of rental property owned and operated in a trade or business by plaintiff Arthur Ujvari.[2] Deductions in the sum of $13,018.81 having already been allowed for the years 1951 and 1952; this suit involves only the years 1953, 1954, 1955 and 1957. Based on an alleged loss of $48,520, which is to be deducted from the taxable income for these years,[3] plaintiffs' refund claim totals $3,567.40.[4]

Plaintiff Arthur Ujvari came to this country in 1940 and has never returned to Hungary. In 1943 he inherited from his father a one-half interest in certain property in Hungary. This property was confiscated by the Hungarian Communist government in 1952. The sole issue in the case is the proper tax basis of this property, namely the fair market value at the time of the inheritance in 1943 less depreciation of the buildings to 1952. Internal Revenue Code of 1939, §§ 23(i), 113(a) (5), (b).

The property is situated at 41 Kossuth Lajosutes in Keszethely, Hungary, a town of 15,000 to 20,000 population about 120 miles southwest of Budapest in the Lake Balaton resort area. It is on the main thoroughfare of the city, opposite a church and high school. The plot on which the buildings are located is approximately 25,000 square feet with a frontage of about 80 feet and a depth of about 350 feet. There are two structures on the plot. The first of these is an L-shaped building, the front wing facing the street having two stories, and the rear wing on the right of the rear courtyard having only one story. The main building is comprised of 3 large and 2 small stores on the ground floor and a total of eight apartments of varying sizes in both wings. In addition, there was a small house in the courtyard consisting of a single four room apartment.

The main building, whose ground floor was approximately 90 years old and whose upper story was added around 1900, was made of brick with tile roofing. The apartments were described as having high ceilings and parquet floors and were supplied with water and electricity. However, there was no central heating and wood burning ovens were necessary.

1. Section 23. "In computing net income there shall be allowed as deductions: * * * (s) * * * For any taxable year beginning after December 31, 1939, the net operating loss deduction computed under section 122."

Section 122(a). "As used in this section, the term 'net operating loss' means the excess of the deductions allowed by this chapter over the gross income, with the exceptions, additions, and limitations provided in subsection (d)."

(d) (5). "Deductions otherwise allowed by law not attributable to the operation of a trade or business regularly carried on by the taxpayer shall * * * be allowed only to the extent of the amount of the gross income not derived from such trade or business. * * * This paragraph shall not apply with respect to deductions allowable for losses sustained after December 31, 1950, in respect of property, if the losses arise from fire, storm, shipwreck, or other casualty, or from theft."

2. The claim of Tessie Ujvari is based solely on the fact that she filed a joint tax return with her husband for the years in question.

3. Plaintiffs' net taxable income for these years is as follows:

| Year | Net Taxable Income |
| --- | --- |
| 1953 | $7,669.99 |
| 1954 | 7,921.08 |
| 1955 | 7,748.19 |
| 1957 | 5,876.00 |
| | $29,215.26 |

4. The income tax paid by plaintiffs during these years is as follows:

| Year | Tax Paid |
| --- | --- |
| 1953 | $ 1,273.10 |
| 1954 | 1,191.02 |
| 1955 | 326.74 |
| 1957 | 776.54 |
| | $ 3,567.40 |

The property had been operated after the death of the father by the plaintiff's sister, Janka Frimm, the owner of the other half-interest. Mrs. Frimm testified that the gross rentals received amounted to 19,200 pengos a year but that there was no net rental income derived from the property, the cost of repairs and management being so high that it was necessary to request that additional funds be sent from Mr. Ujvari in America. She testified that she desired to raise the rents but was prevented from so doing by rent control laws then in force in Hungary.

## VALUE OF THE BUILDINGS

The plaintiffs called Mr. Lasszo E. Acsay as their expert witness. Formerly a Hungarian architect in Budapest, he had testified in a number of cases before the Tax Court involving confiscations of other Hungarian properties. Mr. Acsay estimated the value of the buildings to be 75,000 pengos. This estimate was based on reproduction cost new less 75% depreciation. He stated that it was a rule in Canada and in all of Europe that any building in use has a value of at least 25% of its reproduction cost. On cross-examination he testified that this estimate would be unaffected by the fact that there was no rental income, this being considered only when he wanted to increase value. As an alternative method of valuation, he contended that the *gross* income of rental property multiplied by eight would yield a minimum value. He testified that such a rule is used in Hungary for the purpose of tax assessment when there is a transfer of property and considering the nature of the property here at issue, the appropriate multiplier would be twelve, and the buildings therefore worth 200,400 pengos.

The government's expert, Mr. Mario Triolo, testified that the best method of valuation when dealing with rental properties is the income capitalization method rather than reproduction cost. In response to a hypothetical question based on plaintiffs' proof, he found that the buildings involved herein had little or no value.

The Treasury regulations define fair market value as "the price at which * * * property would change hands between a willing buyer and a willing seller, neither being under compulsion to buy or to sell." Treasury Regs. 108, § 86.19(a); now Treas. Reg. § 25.2512–1. Application of this standard is always a difficult one, made all the more hazardous when the property is in distant and unfamiliar surroundings. Absent evidence of sales of similar properties or real offers to buy or sell the property in question, any estimate as to market value must at best be speculative in nature. The problem is further complicated by the fact that different valuation techniques in current use frequently lead to disparate estimates of value. That such is the case is dramatically illustrated by the facts here. The government's expert, using the net income capitalization technique, has concluded that these buildings have little or no value. Plaintiffs' expert, basing his estimate on reproduction cost less depreciation or on gross income capitalization, would find the buildings to have significant value. No suggestions as to any means of reconciling or compromising these estimates has been offered to this Court. It thus becomes necessary to turn to an evaluation of the relative merits of these methods.

It would appear to be an established rule when dealing with rental property that the replacement cost of property ordinarily sets only the approximate upper limit to its value. See generally 1 Bonbright, The Valuation of Property 150–176 (1937); 2 Orgel, Valuation under Eminent Domain, §§ 188–199 (2d ed. 1953). The proper technique, as a general matter, is to value the property at the lower of replacement cost or income capitalization. See People ex rel. Lehigh Valley R. Co. v. Harris, 168 Misc. 685, 6 N.Y.S.2d 794 (Sup.Ct.1935). The use of replacement cost depends heavily on the notion that what it would cost the owner of the property to replace it with

a similar property on another location is at least some evidence as to its value. However, where the facts are such as to make it unlikely that the present owner would consider the expenditure of any capital to replace a structure having no demonstrated earning power, such an assumption has little validity. On the other hand, from a prospective purchaser's viewpoint, it would be highly unlikely that he would be willing to pay a sum for the structure bearing no relation whatever to past and possible future earnings thereon, especially when increases in rents to remunerative rates were prohibited by law.

■■ On the facts of this case, the conclusion that the buildings in question had little or no value when they were expropriated seems inescapable. The buildings were 90 years old, there was no central heating and there had been no net rental income for a period of several years. There is no evidence to indicate that the repairs made by plaintiff and his sister during these years were due to any extraordinary circumstances. On the contrary, the high expenditures relative to income were more likely those that become necessary as a building nears the end of its useful life. Although the Court is mindful of the fact that it is dealing with property in a foreign country where a 90-year-old structure might be considered more valuable than a similar property in this country, the earnings picture is convincing evidence to this Court that the structure had little or no value. The Court is of the opinion that the reproduction cost estimate offered by the plaintiffs is highly unreliable as an estimate of value. See Bowie Lumber Co. v. United States, 155 F.2d 225 (5th Cir., 1946). In those instances where reproduction cost is acceptable as a measure, it has been suggested that extreme care should be taken to assure that full deductions are made for depreciation and other forms of obsolescence. See 2 Orgel, supra at § 199. This Court is not prepared to accept the unsupported contention that any building in use is at least worth 25% of its reproduction cost.

■ It is necessary to dispose briefly of plaintiffs' contention that a capitalization of gross rentals, at a rate lower than that which would be applied to net rentals, is a proper alternative method of valuation. Courts using the income capitalization technique frequently do not make clear whether they are dealing with net or gross rentals. Although it may be the case that there is frequently a sufficient correlation between net and gross rentals to make capitalization of the latter a significant measure of value, see Somers v. City of Meriden, 119 Conn. 5, 174 A. 184, 95 A.L.R. 434 (1934), it is clear that its use in the present case is merely a device to avoid the fact that there are no net rentals on which an appropriate estimate of value could be based. Under such circumstances, capitalization of gross rentals is of no probity on the question of value.

## VALUE OF THE LAND

■ Mr. Acsay testified that the land should be valued at the rate of 150 pengos per square fathom. An area of 25,000 square feet, equal to approximately 700 square fathoms, would be worth 105,000 pengos. Mr. Acsay's estimate of the value of the land was 180,000 pengos. This was based on an area of 43,500 square feet, a figure he claims that Mr. Ujvari gave him and that he estimated from a small snapshot of the building. However, Mr. Ujvari's refund claim filed with the Internal Revenue Service, his complaint in this action and his direct testimony all indicate an approximate area of 25,000 square feet. In view of Mr. Ujvari's greater familiarity with a plot that Mr. Acsay has never seen firsthand, the Court finds that the 25,000 square feet figure is the proper one.

■ There was some discussion at trial as to whether in the event the Court was to find that the buildings were of no value, the cost of demolition of the buildings ought to be deducted from the

value of the land since a willing purchaser of the land would have such cost in mind in offering to purchase the plot. Although the Court is of the opinion that such a deduction would be appropriate, in view of its conclusion that plaintiffs' loss does not exceed that already allowed, detailed consideration of this question is unnecessary.

## THE EXCHANGE RATE

The only remaining problem is the appropriate exchange rate in 1943 of Hungarian pengos into United States dollars. Plaintiffs in their refund claim asserted that in 1943 one pengo was worth .1476 dollars. At trial they sought to have introduced certain tables that provide a conversion rate for pengos into Swiss francs and a rate for Swiss francs into United States dollars. The Court refused to accept such testimony because in the Court's opinion the witness failed to qualify as an expert.

Plaintiffs' witness, Mr. Doman, was a lawyer who was before the Court to testify primarily on a question of Hungarian property law then at issue in the case. He testified that he had been attorney in a number of cases involving the Hungarian rate of exchange, that in 1942 he taught the subject of war economies involving matters of foreign exchange at William and Mary, and that he was a reporter at the International Monetary Committee of the International Law Association in which capacity he prepared reports dealing with foreign exchange rates. However, there was no indication that Mr. Doman was familiar with the factual basis for these tables and with the manner in which they were prepared. Since the government urges that the tables involved were subject to certain limitations, such as that in 1943 Hungary was one of the Axis powers, or at least within the Axis sphere of influence, the Court was of the opinion that only a qualified expert fully familiar with these tables could properly testify with respect to them.

■■ In addition, the plaintiffs urge that the Court invoke the doctrine of judicial notice to cure the absence of any evidence in the record in support of their claim for a higher exchange rate. They point to a number of Tax Court cases involving Hungarian properties in which the exchange rate urged upon this Court was found to be appropriate. See Elek v. Commissioner, 30 T.C. 731 (1958); Daniel v. Commissioner, 20 T.C.M. 1960–274 (1960); Lajtha v. Commissioner, 20 T.C.M. 1961–273 (1961). However, this Court is not bound by determinations made in the Tax Court. The Court of Appeals has recently admonished the District Courts against using the doctrine of judicial notice on fact questions "to go outside the record unless the facts are matters of common knowledge or are capable of certain verification." Alvary v. United States, 302 F.2d 790, 794 (2d Cir., 1962). Although Tax Court cases are frequently cited for propositions of law, the issue of the rate of exchange in 1943 is a question of fact for independent determination by this Court.

■ Since the only value for the Hungarian pengo in fact introduced in the record is .1476 dollars, it is that value that must be accepted for use in this case.

## CONCLUSION

Using the above exchange rate, the value of the land taken is found to be $15,498. Plaintiffs' half-interest is therefore worth no more than $6630,[5] and as they have already been allowed a loss deduction and carryback in the amount of $13,018.81, a further recovery in this action is not indicated.

The foregoing shall constitute the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.Proc. 52(a).

Judgment for defendant.

---

5. This figure is arrived at by deducting a 15% discount due to the fact that plaintiff owns only a half-interest. This percentage was agreed upon by the parties as a proper estimate.