Hubert C. Stratton and Margaret M. Stratton v. Commissioner.
Stratton v. Commissioner
Docket No. 808-67.
United States Tax Court
T.C. Memo 1969-50; 1969 Tax Ct. Memo LEXIS 241; 28 T.C.M. (CCH) 284; T.C.M. (RIA) 69050; March 17, 1969, Filed George C. Shattuck and Hubert C. Stratton, 1000 State Tower Bldg.,Syracuse, N.Y., for the petitioners. Ferdinand J. Lotz III, for the respondent. SIMPSON
Memorandum Findings of Fact and Opinion SIMPSON, Judge: The respondent determined deficiencies in the petitioners' income taxes as follows: Taxable Year
Deficiency
1961
$6,838.94
1962
6,939.60
1963
8,012.95
1964
7,622.05 The issues for decision in this case are whether the respondent's valuation of certain charitable contributions is correct, and whether the notice of deficiency containing such valuation is effective. *242 Findings of Fact Some of the facts have been stipulated, and those facts are so found. The petitioners, Hubert C. Stratton and Margaret M. Stratton, are husband and wife, who resided in Fayetteville, New York, at the time the petition was filed in 285 this case. Their joint Federal income tax returns for the taxable years 1961 through 1964 were filed with the district director of internal revenue at Buffalo, New York. Mr. Stratton will be referred to as the petitioner. The petitioner, prior to August 7, 1961, owned all 188 shares of the outstanding capital stock of Navy Island Real Estate Company, Inc., hereinafter referred to as the Corporation. The petitioner donated 19 shares of this stock to the Village of Oxford, New York, on each of the following dates: August 7, 1961, January 15, 1962, January 4, 1963, and during the month of December 1964. At the time of the initial gift, it was Mr. Stratton's intention eventually to give all his stock in the Corporation to the Village of Oxford, and by the end of 1965 this intention had been effectuated. Mr. Stratton turned over managerial control of the Corporation to the Village at the time of the first gift of stock. On their *243 income tax returns for each of the years 1961 through 1964, the petitioners deducted $14,421.76 in respect of the contributions of stock to Oxford. The respondent determined in his deficiency notice that the claimed deductions were excessive and recomputed the allowable deductions in accordance with the following analysis: Analysis of Value of the
Donated Corporation Stock
Corporation Assets
1961
1962
1963
1964
Fair market value of land and
$20,000.00
$20,000.00
$20,000.00
$20,000.00
building known as Navy Island
Block
Other assets
11,195.33
5,961.07
5,104.16
5,104.16
Total assets
$31,195.33
$25,961.07
$25,104.16
$25,104.16
Corporation Liabilities
Total liabilities
$11,920.77
$11,018.92
$14,015.84
$14,015.84
Equity
19,274.56
14,942.15
11,088.32
11,088.32
188 shares outstanding value
$ 102.53
$ 79.48
$ 58.98
$ 58.98
of one share
19 shares donated
1,948.07
1,510.12
1,120.62
1,120.62
The value of the contributed stock depends primarily on the values of land and a commecical building thereon which were the principal assets of the Corporation at the times of the contributions. The building, which together with *244 the land was known as the Navy Island Block, was constructed in 1917 and consisted of a two-story masonry and frame structure with a steel skeleton and a full basement. The front of the building was face brick; the sides and rear were stucco over tile. The first floor contained six store areas in a total floor space of approximately 8,700 square feet; the second floor contained a series of offices and rooms in approximately the same area as the first floor. The only elevators in the building were two rope elevators located in two of the stores - one running from the basement to the first floor, and the other running from the basement to the second floor. Generally, the building's basement flooded twice a year, at which times its usefulness to tenants was severely limited. In 1961, there was a fire in the Navy Island Block, and the Corporation recovered $23,137.13 insurance proceeds. Of this amount, $17,179.67 was expended in repairing the building. Below is a schedule detailing the rentals charged tenants of the Navy Island Block during 1961. Rentals Charged Tenants of Navy Island Block During 1961
First Floor
Tenant
Rent
Emerson Company
$1,680.00
New York State Electric
576.00
Bower Store
750.00
Potter Store
780.00
Town Hall
750.00
School Rooms
2,160.00
Total
$6,696.00
*245 Second Floor
Tenant
Rent
Masonic Lodge and Eastern Star Lodge
$ 399.96
Farm Bureau
360.00
Attorney Wasser
360.00
Dr. Mayhew
780.00
Total
$1,899.96
Below is a comparative income statement of the Corporation for the years 1956 through 1964. 286 Comparative Income Statement of Navy Island Real Estate Company, Inc., for
the Period 1956 Through 1964
1956
1957
1958
1959
1960
Income:
Rents
$7,131.00
$6,376.00
$5,647.00
$7,282.00
$7,400.00
Interest
Capital Gains
7,131.00
6,376.00
5,647.00
7,282.00
7,400.00
Expenses:
Repairs
2,638.78
1,220.00
a 1,156.01
1,752.07
1,234.87
Taxes
1,903.55
1,828.28
1,524.29
3,427.87
2,441.79
Insurance
618.56
674.50
786.92
682.07
770.33
Janitor Service
360.00
Light & Power
141.07
136.37
171.37
200.47
199.84
Office & Misc.
95.10
62.70
124.30
108.10
77.40
Water
73.94
79.15
100.96
79.70
117.00
Coal (Fuel)
2,300.00
2,375.00
1,783.15
2,721.91
2,558.92
Legal & Acct.
Interest
Sundry Expenses
Officers' Exp.
Net Operating
Loss Deduction
8,131.00
6,376.00
5,647.00
8,972.19
7,400.15
Net Profit or
(1,000.00)
0
0
(1,690.19)
( .15)
(Loss) Before
Federal In- come
Taxes
Adjustment to
Elimi- nate
Nonoperating
Income & Expense
Net Operating
(1,000.00)
0
0
(1,690.19)
( .15)
Profit or (Loss)
Before Federal
Income Taxes
*246 Comparative Income Statement of Navy Island Real Estate Company, Inc., for
the Period 1956 Through 1964
1961
1962
1963
1964
Total
Income:
Rents
$6,504.49
$ 7,636.00
$7,997.76
$5,315.10
$61,289.35
Interest
101.55
b 174.83
151.45
149.89
577.72
Capital Gains
5,957.46
6,606.04
13,768.29
8,149.21
5,464.99
67,824.53
Expenses:
Repairs
494.85
649.89
648.18
378.57
10,173.22
Taxes
2,343.30
1,585.05
2,897.36
1,372.30
19,323.79
Insurance
900.00
1,273.02
1,454.59
1,215.46
8,375.45
Janitor Service
360.00
Light & Power
295.93
149.53
3,941.77
113.43
5,349.78
Office & Misc.
85.48
21.40
64.20
638.58
Water
62.49
120.97
123.06
125.09
882.36
Coal (Fuel)
689.00
2,626.27
1,001.47
800.00
16,855.72
Legal & Acct.
1,125.00
1,125.00
Interest
1,150.13
690.91
635.33
575.87
3,052.24
Sundry Expenses
10.75
10.75
Officers' Exp.
844.42
844.42
Net Operating
Loss Deduction
3,000.02
3,000.02
7,915.87
10,181.14
10,723.16
4,644.92
69,991.3
Net Profit or
(1,309.83)
3,587.15
(2,573.95)
820.07
(2,166.90)
(Loss) Before
Federal In- come
Taxes
Adjustment to
( 101.55)
(3,132.27)
( 151.45)
( 149.89)
(3,535.16)
Elimi- nate
Nonoperating
Income & Expense
Net Operating
(1,411.38)
454.88
(2,725.40)
670.18
(5,702.06)
Profit or (Loss)
Before Federal
Income Taxes
*247 287 During each of the years 1961 through 1964, the most profitable use of the Navy Island Block was as rental property, for leasing to commercial and professional establishments and civic and governmental agencies. During those years, the fair market value of the Navy Island Block was $35,000. Opinion The principal issue for decision is the value of the Corporation stock donated by the petitioner to the Village of Oxford in 1961, 1962, 1963, and 1964. Section 170 of the Internal Revenue Code of 1954[1] allows a deduction from gross income for charitable contributions. In the case of contributions made in property other than money, the amount of the deduction is the fair market value of the contributed *248 property, which is defined as the amount "at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170-1(c) (1), Income Tax Regs.
The parties called four expert witnesses who appraised the Navy Island Block as follows: [2]
Appraisal
Witness for
Witness
Method
Appraisal
Petitioners
Vladimir Breuer
Reproduction Cost
$196,422
(exclusive of
land)
Petitioners
John Forest
Reproduction Cost
$131,000
(exclusive of
land)
Petitioners
Leo D. Craine
Reproduction Cost and
$142,000
Capitali- zation of
Income
Respondent
Viggo Hansen
Reproduction Cost,
$ 35,000
Capitalization of
Income, and Comparable
Sales
Messrs. Breuer and Forest based their appraisals on reproduction cost less depreciation. Although this method of valuation may be highly *249 relevant to the determination of fair market value in certain cases, we believe it is inapposite here since we can perceive no relationship between reproduction cost and fair market value. Compare Ujvari v. United States, 212 F. Supp. 223, 226-227 (S.D.N.Y. 1963); Henry A. Cleland Estate Co., Ltd., 29 B.T.A. 436, 442-443 (1933); August Grill, Inc., 9 B.T.A. 381, 383 (1927); with Clinton Cotton mills v. Commissioner, 78 F. 2d 292, 295 (C.A. 4, 1935), revg. 28 B.T.A. 1312 (1933). The Navy Island Block was built some 44 years prior to the initial gift of stock. Certainly construction methods had changed a great deal in the interim, and no evidence indicates that if one were to construct a building for a similar purpose in 1961 he would use the same methods and materials, or incur the same costs. But more importantly, since the highest use of the property was the production of rental income, a purchaser would not be as much concerned with the reproduction value of the structure as with the rental income that could be derived from it, or the price for which is could be sold. Since these would be the principal considerations *250 to a potential purchaser, they must be our main guidelines in determining value. Furthermore, in the period 1956 through 1964, the Navy Island Block incurred operating losses totaling $5,702.06. Surely, no willing buyer would pay a purchase price of between $131,000 and $196,000 based on reproduction value. We come then to the appraisal by Mr. Craine, which was based on reproduction cost less depreciation and capitalization of income. Mr. Craine's appraisals resulted in valuations of $143,485 under the reproduction cost method and $142,000 under the income capitalization method. However, we are not convinced that evaluating the Navy Island Block under the capitalization of income method should yield the figure obtained by Mr. Craine. Mr. Craine based his appraisal on estimated net annual income of $12,780, which he derived by subtracting estimated operating expenses of $6,415 from estimated gross rental revenues of $19,195. In the past, we have expressed the view that appraisals based on the actual income and expenses of the subject property are generally more reliable than those based on estimates. Ambassador Apartments, 288 Inc., 50 T.C. 236, 243 (1968), affd. *251 406 F. 2d 288 (C.A. 2, 1969). Mr. Craine's estimated income and expenses are significantly different from the results of the actual operations of the Corporation. His estimate of $6,415 annual expenses is substantially lower than the average operating costs per year of $7,443 incurred over the period 1956 through 1964 and $7,616 incurred over the period 1961 through 1964. No reason is given for using estimated expenses rather than actual expenses. Mr. Craine estimated annual rental revenue of $1.50 per square foot of first floor area and $.70 per square foot of second floor area. The resulting estimated annual rental income of $19,195 vastly exceeds $6,810, which is the 1956 through 1964 average of rental collections, and $6,863, which is the 1961 through 1964 average of rental collections. The estimate also greatly exceeds the total rentals charged during 1961 - $8,595.96. The petitioners contend that the actual rentals are not indicative of the fair rental value of the property. The petitioner testified that since its erection, and through the year 1964, the Navy Island Block had always been operated as a sort of civic project. The Navy Island Block was, we are *252 told, operated not for profit but as a civic effort to promote the economic health of the community, and therefore, just enough rents were charged to make the property self-sustaining. The implication of this assertion is that substantially higher rents could have been charged tenants of the Navy Island Block. The petitioners attempt to support this contention by Mr. Craine's appraisal, which arrives at the fair rental value of the Navy Island Block by a comparison of rentals being charged in Oxford. For his comparison, Mr. Craine chose three other commercial properties in Oxford: a drug store, a supermarket, and a grocery store. We do not think that these comparables justify Mr. Craine's conclusion as to the fair rental value of the Navy Island Block. Mr. Craine's report states that the drug store had a fair rental value of $1.25 per square foot per year, and that the supermarket yielded a rent of $2.33 per square foot per year. Each of these figures is substantially higher than the rent charged for the Navy Island Block properties, but we do not think that an adequate basis for comparison has been established. See Philip R. Brand et al., 5 B.T.A. 297, 299 (1926). *253 The drug store was not under lease, and its fair rental value is based solely on the owner-operator's opinion as expressed to Mr. Craine. Therefore, the alleged rental cost is merely an estimate by a person who is not an expert. The supermarket was a relatively new, large, one-story building with its own parking facility. Mr. Craine did not know whether it had a useable basement area. Since it was physically a significantly different type of building and since it had its own parking facility, any comparison of the two properties is difficult, if not impossible. The grocery store was located in a two-story building with a basement not subject to flooding and was under lease for an amount which came to $1.00 per square foot of first floor area. It has not been shown whether the basement or the second floor was included in the leased premises. If so, the rent per square foot would be substantially diminished. In any event, the rent derived from the grocery store is not significantly more on a per-square-foot basis than that charged the first floor tenants of the Navy Island Block during 1961. In additon to the weakness of Mr. Craine's comparables, we think his appraisal is subject to *254 the criticism that it employs an improper capitalization rate. The capitalization rate is based on a remaining life of 50 years. In his testimony, Mr. Craine stated that 50 years was a reasonable depreciation period, since the building, if properly cared for, would last at least this long. The evidence indicates that the Navy Island Block building is a sound structure, but this fact alone does not justify the extended life argued for by the petitioners, since the question is not how long the building will last, but rather, how long it will continue to be economically useful. The petitioners have not advanced any justification for a 50-year economic life, and as appears below, we have accepted the respondent's economic life figure of 20 years as being more realistic. The respondent's expert witness, Mr. Hansen, appraised the Navy Island Block at $35,000. Mr. Hansen employed a combination of the reproduction cost, capitalization of income, and comparable sales methods in arriving at his appraisal. He computed the reproduction cost less depreciation to be $42,000. In arriving at this figure, Mr. Hansen took account of the fact that in 1961 the building needed repairs and 289 improvements *255 totaling $30,000. He depreciated the full reproduction cost on the basis of a total economic life of 60 years and a remaining economic life in 1961 of 20 years. It appears that the information which Mr. Hansen used in determining the value of the land was slightly erroneous, but the error is not large enough to make any significant difference in the outcome. In applying the capitalization of income method, Mr. Hansen used the actual rentals charged for the Navy Island Block in 1961, with slight upward adjustments in respect of those tenants whose rent he felt was too low. Under this method, he also used a remaining economic life of 20 years. His appraisal, based on capitalization of income, was $26,400. Mr. Hansen found only one sale of a business property in the center of the Village on which he could base a comparable sale valuation of the Navy Island Block. The property sold was significantly different, but he made an adjustment to take account of that difference and reached a comparable sale valuation of $35,000. Although Mr. Hansen's appraisal may be questioned on several grounds, we see no weakness in it which would, if corrected, inure to the petitioners' benefit. It is significantly *256 lower than the valuations submitted by the petitioners principally because it takes account of needed repairs, capitalizes the actual income of property, and employs a remaining economic life of 20 years. We think Mr. Hansen was correct in his judgment on each of these factors. The repairs and improvements he considered were essential to the continuing use of the property. The evidence indicates that the rental income used by Mr. Hansen closely approximates the income production capacity of the building. Finally, although the building is sound and may last for many years, we accept Mr. Hansen's opinion that the demand for it will probably terminate earlier as a result of the growth of shopping centers in the surrounding area and the increasing patronage by Oxford residents of such shopping centers. After careful consideration of all the evidence and testimony, we have reached the conclusion that Mr. Hansen's ultimate valuation of $35,000 represents a reasonable valuation of the Navy Island Block. The respondent urges that the liquidating value of the stock of the Corporation should be reduced by one-third to determine its fair market value. This argument is based on the poor earnings *257 record of the Corporation, the absence of a ready market for the sale of the stock, the retention of voting control by the petitioner during the years in question, and the fact that the Navy Island Block building was fully depreciated by 1961. We cannot agree with the respondent's arguments. The only significant asset of the Corporation was the Navy Island Block, and we have accepted an appraisal of this property based, in part, on capitalization of earnings and comparable sales. By its very nature then, the appraisal took into account both the earnings record of the property and its salability. To discount further the value of the stock on account of these factors would be unjustified. The factor of lack of voting control by the Village of Oxford seems irrelevant in light of the facts of the case. At the time of the initial gift in 1961, the Village was invested with full managerial control of the Corporation and the Navy Island Block. Furthermore, both the petitioner and the Village expected that all Corporation stock would eventually be transferred to the Village. We think that a willing buyer would not significantly discount the price he was willing to pay for a minority interest *258 in a corporation when at the time of his purchase he would obtain actual control of management and could reasonably expect to eventually obtain full voting control. Finally, the respondent asks us to discount the value of Corporation stock because the Navy Island Block building had been fully depreciated for tax purposes by 1961. Prior Corporation earnings do not disclose any real need for tax benefits such as depreciation deductions, and therefore, we cannot perceive why a willing buyer would accord this factor much weight. Additionally, a buyer interested in obtaining a high basis for the Navy Island Block could do so either by buying the building directly, or, in most cases, by acquiring the stock and liquidating the Corporation. Although the fair market value of stock is not always directly proportional to the value of underlying corporate assets, we believe such to be true in this case. Relying on Helvering v. Taylor, 293 U.S. 507 (1935) the petitioners argue that the determination was arbitrary and capricious, and the burden of proving the correct amount of any deficiency should be on the respondent. Helvering v. Taylor established that a taxpayer satisfies his *259 burden of proof in a Tax Court proceeding when he shows that the asserted deficiency is "without rational foundation and excessive." 293 U.S. at 514. However, based 290 upon evidence introduced by the respondent, we have determined that the Navy Island Block was worth $35,000 during the years in question. Therefore, we do not decide this case on burden of proof principles, but rather on the basis of the evidence before us. See Zeddies v. Commissioner, 264 F. 2d 120, 126 (C.A. 7, 1959), cert. denied 360 U.S. 910 (1959). Cf. Charles Oran Mensik, 37 T.C. 703, 724-725 (1962), affd. 328 F. 2d 147 (C.A. 7, 1964), cert. denied 379 U.S. 827 (1964). In addition to their burden of proof argument, the petitioners contend that the deficiency notice sent them was wholly void since the Commissioner did not act expeditiously in making his determination, and since the deficiencies were computed in an arbitrary and capricious manner. Although a great deal of evidence and argument has been devoted to this issue, we see no basis for the petitioners' contention. See Charles Crowther, 28 T.C. 1293, 1301 (1957), *260 affd. on this issue 269 F. 2d 292 (C.A. 9, 1959); H. F. Kerr, 5 B.T.A. 1073, 1095 (1927). Taxpayers, of course, are protected from undue delay in the assertion of deficiencies by the provisions relating to periods of limitation on assessment and collection. Section 6501. The petitioners have not shown or even alleged that these provisions were not followed. The petitioners have cited no authority for the proposition that a deficiency notice is totally null and void if the procedure by which the deficiency is determined is arbitrary and capricious. Moreover, although we have found that the Navy Island Block was worth almost twice the amount originally determined by the respondent, the evidence indicates that the respondent's agents had some bases for their determination and did not act in an arbitrary or capricious manner. Accordingly, the procedural effect of the notice of deficiency must be sustained, regardless of the petitioners' legal argument. Decision will be entered under Rule 50. Footnotes
a. Although the tax return for this year disclosed no specilic amount for repairs, zero taxable income is reported which would require operating expenses of at least $1,156.01, in addition to those specifically set forth. Moreover, it would seem highly unusual for the Corporation to have no repair expense for this year while it had such expenses for all other years during this 9-year period. ↩
b. Insurance proceeds from fire loss not reinvested.↩
1. All statutory references are to the Internal Revenue Code of 1954.↩
2. All appraisals except Mr. Breuer's were made as of 1961; Mr. Breuer's appraisal appears to be as of 1965-1966.↩