ESTATE OF THOMAS L. KAPLIN, DECEASED, MAURY I. KAPLIN, EXECUTOR AND GERTRUDE F. KAPLIN, SURVIVING SPOUSE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; GERTRUDE F. KAPLIN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Kaplin v. Commissioner
Docket Nos. 16118-79, 16119-79.
United States Tax Court
T.C. Memo 1986-167; 1986 Tax Ct. Memo LEXIS 439; 51 T.C.M. (CCH) 927; T.C.M. (RIA) 86167; April 24, 1986. *439 Held, fair market value of stock donated by an individual to the City of Toledo redetermined on remand. Gerald P. Moran and John G. Mattimoe, for the petitioners. Richard S. Bloom, for the respondent. NIMS
SUPPLEMENTAL MEMORANDUM OPINION NIMS, Judge: This consolidated case is before us on remand from the United States Court of Appeals for the Sixth Circuit. In a published opinion decided and filed November 26, 1984, the Court of Appeals reversed the opinion of this Court and remanded the case for further consideration consistent with the the Circuit Court's opinion. Estate of Kaplin v. Commissioner,748 F.2d 1109 (6th Cir. 1984), revg. and remanding T.C. Memo. 1982-440. Specifically, the Court directed us to consider the March 21, 1978, sale of the Plaza Properties by the City of Toledo, Ohio, and the tax-assessed value of the Plaza Properties on April 2, 1976, in reconsidering the fair market value of the Plaza, Inc. stock donated on December 30, 1975, by Gertrude F. Kaplin to the City of Toledo. [1]
*440 The facts set out in our prior opinion are incorporated herein by this reference, as hereinafter modified and augmented. We turn first to the Circuit Court's direction that we reconsider the impact the March 21, 1978, sale of the Plaza Properties by Toledo to the Klingbeil Management Group (Klingbeil). The sale took place slightly more than two years after the date Gertrude F. Kaplin donated to Toledo the stock of Plaza, Inc., the only significant asset of which was the Plaza Properties. According to the terms of the Contract for Purchase and Sale, Toledo transferred the Plaza Properties pursuant to the following terms: 1. $25,000 cash; 2. a letter of credit of $150,000 from Klingbeil to guarantee its responsibility for the renovation of the Plaza Properties; 3. a commitment to spend $1.9 million for renovation; and 4. the acceptance of a 10-year restriction prohibiting the resale of such properties without City approval. In addition, the contract provided, among other things, that Toledo would "cooperate fully with Purchaser" in acquiring tax-free financing for all of the purchaser's anticipated renovation costs. Toledo would also cooperate with Klingbeil in its *441 efforts to obtain historic preservation certification and "any and all exemptions from real property taxes provided for in Ohio Revised Code § 3735.67 for the respective maximum periods allowed thereunder." The Circuit Court held that the fact that the commitments made by Klingbeil to Toledo constitute "consideration of at least $175,000 is highly relevant and should have been considered by the Tax Court." 748 F.2d at 1111. The letter of credit referred to above was never introduced into the record by petitioners, which would suggest the possibility that its terms in their entirety would be detrimental to petitioners' contention that the letter of credit was a cash equivalent. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947); see also Herrick v. Commissioner,85 T.C. 237, 257 (1985); and Chiu v. Commissioner,84 T.C. 722, 731 (1985). Indeed, the lack of any evidence suggesting that the letter of credit was ever presented for payment by Toledo, in spite of Klingbeil's failure to fulfill the terms of the contract, militates *442 strongly against petitioners' argument that the letter of credit was a cash equivalent. Nevertheless, we concur with the Circuit Court that the sale of the Plaza Properties by Toledo to Klingbeil is significant in determining fair market value under the particular circumstances of this case, even though the sale occurred more than two years after the valuation date, and that the contract provision relating to the letter of credit is a significant factor in connection with such sale. The contract between Toledo and Klingbeil for the sale and purchase of the property appears to be fully enforceable on its face. The contract provides that "the purchase price for the premises shall be Twenty-five Thousand Dollars ($25,000.00) to be paid by certified check at closing." As to the letter of credit, paragraph 7 of the contract provides: 7. Letter of Credit. Purchaser shall deliver to Seller at closing a letter of credit issued by and drawn on a credit-worthy financial institution for the account of Seller in the amount of One Hundred Fifty Thousand Dollars ($150,000). Seller shall have the right to present such letter of credit for payment if and only if Seller reassumes legal *443 title to the Property, because of default by Purchaser under this Contract, after the closing hereof and during the period during which such letter of credit is irrevocable. Such letter of credit shall be irrevocable during the period of time in which restoration and rehabilitation of the property occurs. No other provision of the contract renders conditional Klingbeil's commitments as to payment of the $25,000 purchase price or the delivery of the letter of credit. Klingbeil is thus committed to a minimum expenditure of $175,000 in connection with its acquisition of the Plaza Properties. As previously stated, the sale to Klingbeil occurred more than two years after the valuation date. As the Circuit Court points out, "[t]he record demonstrates, however, that the City of Toledo did not improve the property during this period but only watched over it. If anything, the property would have decreased in value during this period because little attention was given to it." 748 F.2d at 1111. Thus, in this particular situation the post-valuation date sale is significant. The Circuit Court hypothesizes that "the Tax Court may not have considered the sale because of evidence *444 in the record that the City of Tolede did not intend to sell the property for fair market value but only tried to recoup its holding costs. This evidence, however, would suggest that the fair market value is actually greater than the sales price * * *." 748 F.2d at 1111.While this may well be true, it is also true that by the terms of the contract Klingbeil was only irretrievably out of pocket $175,000, which were 1978 dollars. The valuation date is December 30, 1975. The time value of money, particularly in an inflationary period such as the late 1970's, would militate against our speculating that the fair market value of the Plaza Properties on December 30, 1975, was greater than the $175,000 Klingbeil was willing to hazard in March, 1978. On the other hand, as the Circuit Court's comment suggests, the December 30, 1975, value was not likely to have been significantly less than it was in March, 1978. We are not, however, convinced by petitioners' argument that three additional elements of the contract warrant an upward adjustment from the $175,000 figure, namely, the commitment by Klingbeil to spend $1.9 million for renovation, the 10-year restriction prohibiting *445 the resale of the Plaza Properties without Toledo's approval, and the evidence indicating that Toledo sought only to recoup the amount it expended to carry the property during its term of ownership. We have already dealt with the latter of the above three arguments and will not repeat ourselves. As to the first and second arguments, we would merely point out that if the renovation had been carried out as planned, it would have represented a quid pro quo enhancement of the value of the property long after the December, 1975, valuation date. The fact that Klingbeil might have been willing to spend $1.9 million does not mean that the property was inherently worth $1.9 million before any such expenditure. The 10-year resale prohibition has no apparent significance insofar as an increase in value is concerned, and might in fact be viewed as a valuation depressant. In any event there is nothing in the record by which the impact of the resale prohibition could be quantified in a dollar amount. We therefore reject petitioners' additional arguments. We turn now to a consideration of the $864,000 tax-assessed value of the property. The Circuit Court directed us to consider the tax-assessed *446 value because "[a]lthough in certain instances the cost replacement method may not be the best method of ascertaining fair market value, see Ujvari v. United States,212 F. Supp. 223 (S.D.N.Y. 1963), it is a traditionally accepted valuation method and should not be totally ignored by the Tax Court without strong justification. In this case, where the possible rental income from the building was hotly contested, the Tax Court should have considered cost replacement value." 748 F.2d at 1111. Initially, we note that our original determination excluded consideration of the tax-assessed value because petitioners conceded that a replacement cost valuation approach (the method used in the tax assessment) is not a reliable measure of fair market value in the case of such old and highly deteriorated property such as the Plaza Hotel. As stated in our earlier opinion, "[w]e think this concession completely undermines any reliance petitioners place on * * * the tax assessment * * *." Kaplin v. Commissioner,T.C. Memo. 1982-440, revd. and remanded 748 F.2d 1109 (6th Cir. 1984). We nevertheless consider the tax assessment in *447 deference to the Circuit Court's mandate. The Lucas County tax assessor determined the estimated true value of the property to be $864,300 on April 2, 1976. Prior to that time the property was assessed at $404,608. Of the $864,300, $742,900 constituted buildings and improvements [2] according to the Lucas County property record cards which indicate the following: Replacement
Normal
Estimated
Item
Cost
Depreciation
Obsolescence
True Value
Bldg. No. 1
$501,600
55%
25%
$100,300
Bldg. No. 2
775,960
55%
25%
155,200
Bldg. No. 3
772,970
55%
25%
154,600
Bldg. No. 4
492,890
55%
25%
98,600
Bldg. No. 5
87,980
60%
25%
13,200
Bldg. No. 6
1,088,330
55%
25%
217,700
Improvements
23,730
60%
30%
2,200
Improvements
1,850
25%
15%
1,100
The above computations were based on the replacement cost approach. Respondent's expert also utilized a cost approach but arrived at the following results: Estimated
Depreciated
Item
Cost New
Cost Estimate
Bldg. No. 1
$659,772
Bldg. No. 2
969,547
Bldg. No. 3
824,358
Bldg. No. 4
483,742
Bldg. No. 5
102,927
Bldg. No. 6
1,090,071
Other Improvements
20,869
*448 Petitioners contend that the assessor's determination of value supports a valuation of at least $600,000. Conversely, respondent argues that the tax assessment should be ignored because the cost approach method of valuation is an unreliable indicator of value, where, as here, the property being appraised is old and highly deteriorated. We have carefully considered the arguments of petitioners and respondent in light of the Circuit Court's mandate and conclude that under the circumstances of this case there is strong justification for attaching little credence to the tax-assessed value as an indication of fair market value. [3] This conclusion is predicated upon several obstacles which petitioners have failed to overcome. *449 The parties agree that the Lucas County tax assessor's office utilized the cost approach/replacement cost method of valuation. This method of valuation involves estimating and adding together the percentages of physical depreciation, economic obsolescence and functional obsolescence and multiplying the resulting percentage by the estimated cost to reproduce or replace the property. The product is then deducted from the estimated reproduction or replacement cost to arrive at an estimate of value. As is readily apparent from the figures as shown on the county assessor's records and those computed by respondent's expert, the underlying assumptions and data relied on (i.e., estimated cost of replacement and the percentage of depletion and obsolescence) are critical to the ultimate valuation. Petitioners, however, have failed to provide any of the relevant data used by the tax assessor in arriving at his ultimate conclusions. Such failure has precluded us from conducting any meaningful evaluation as to the reliability of the assessor's valuation. Specifically, without some evidence as to how the tax assessor estimated replacement cost or arrived at the particular percentages of obsolescence *450 and depreciation, we are unable to scrutinize the assessor's appraisal for accuracy. In addition, petitioners have failed to demonstrate by way of corroborative valuation that the tax assessment is reliable. On brief, petitioners concede that at best the tax assessment should be used only as a check, setting the upper limit of value. Ujvari v. United States,212 F. Supp. 223, 226 (S.D.N.Y. 1963). Moreover, when determining the value of old and obsolete commercial properties, such as the Plaza Properties, the reproduction or replacement cost method of valuation is an extremely unreliable method of valuation. 212 F.Supp. at 226-227. It is true as petitioners contend that this Court has frequently admitted tax assessment evidence and considered it relevant to the issue of fair market value. See, e.g., Estate of Frieders v. Commissioner,T.C. Memo. 1980-184, affd. 687 F.2d 224 (7th Cir. 1982). However, the rule as we expressed in Frieders is as follows: This Court has approved the use of such assessments as one indicator of value when, as in this case, the relation between assessed value and fair market value is demonstrated. *451 [T.C. Memo. 1980-184.]
Petitioners have failed to recognize the significance of the precise language used, i.e., that tax assessments are only one indicator of value and, more importantly, are only used when the relationship between assessed value and fair market value is demonstrated. Here, petitioners have failed to produce any corroborative evidence whatsoever which would support the tax assessment, based as it was on replacement cost, as a reliable indicator of value. The Burnor appraisal report, heavily relied upon by petitioners, based its valuation of the property primarily upon a projected income approach. Replacement cost was not considered in this report. The Biggs' report, heavily relied upon by respondent, arrives at a fair market value figure based upon an income valuation analysis, which was to some extent supported by Biggs' market data analysis. We rejected the Burnor valuation based upon an income valuation analysis for reasons stated in our prior opinion, and our acceptance of the Biggs' valuation based on the same approach was erroneous, for reasons pointed out by the Circuit Court. The tax assessment "true value" therefore does not corroborate either *452 of the expert's values. The Circuit Court believed the $175,000 consideration committed for by Klingbeil to be "highly relevant" in determining values. We agree and we further conclude that it sets the upper limit on what a willing buyer would pay for the property on December 30, 1975. But while we also fully agree that the tax assessment, purportedly based on replacement cost should not be totally ignored, we do not believe this particular tax assessment to be determinative of fair market value absent any other evidence of value corroborative of the assessed value. See, e.g., Estate of Frieders v. Commissioner,supra (Tax Court relied on expert's market data valuation corroborated by a local tax assessment); Estate of Silvester v. Commissioner,T.C. Memo. 1977-439 (option price corroborated by assessed value). The assessed value here does not corroborate any other reliable value, or vice versa. Therefore, we do not rely on it to determine value. We also question the usefulness of the assessed value in this case as an indicator of fair market value for another reason. On April 2, 1976, the date on which the tax assessor increased the "true *453 value" of the land and buildings of the property from $404,608 to $864,300 (an increase of $459,692, more than double the previous assessed value), the property was already owned by Toledo and therefore no longer a tax revenue producing property. We must view with some scepticism the reliability of the new assessed value in the face of such a dramatic increase, uninhibited as it was by the otherwise to-be-expected protests of an aggrieved taxpayer. As a matter of fact, the tax assessor's reasons for more than doubling the "true value" assessment of the Plaza Properties without any expectation of tax revenue while Toledo held the property remains completely unexplained. For the foregoing reasons, we find the value of the donated Plaza, Inc. stock to be $175,000. Decisions will be entered under Rule 155.
Footnotes
1. Pursuant to the Sixth Circuit's direction we ordered the parties to file briefs on remand addressing these two issues.↩
2. We note that this leaves a land value of $121,400, an amount less than the $154,000 agreed to by petitioners and respondent.↩
3. Cf. Barry v. United States,501 F.2d 578, 582↩ (6th Cir. 1974), which involved a valuation question somewhat akin to the one before us. Among other things, the Circuit Court declined to disturb the trial judge's giving "little credence to the 60/40 allocation of the [tax] assessor's office, as the proofs showed that it was a standard formula and was not based upon an appraisal of actual fair market value of the particular property in question."